















TKL    2/5/01    14:15
3:00-CV-01839    VESS V. CIBAGEIGY CORP USA
*84*
*P/A.*

1  David J. Noonan (055966)
   Dorothy A. Johnson (132849)
2  **POST KIRBY NOONAN & SWEAT  LLP**
   600 West Broadway, Suite 1100
3  San Diego, California  92101-3387
   Telephone:      (619) 231-8666
4  Facsimile:      (619) 231-9593

5  David B. Siegel (*Pro Hac Vice*)
   JoAnn E. Macbeth
6  Laurel Pyke Malson (*Pro Hac Vice*)
   Luther Zeigler (State Bar No. 122154)
7  William L. Anderson (*Pro Hac Vice*)
   **CROWELL & MORING LLP**
8  1001 Pennsylvania Avenue, N.W.
   Washington, D.C. 20004-2595
9  Telephone:      (202) 624-2500
   Facsimile:      (202) 628-5116
10
   Attorneys for Defendant
11   American Psychiatric Association

12

13                **UNITED STATES DISTRICT COURT**

14              **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15  TODD D. VESS, a Minor, by DEBORAH VESS, his Guardian ad Litem, individually, on behalf of those Similarly Situated and on behalf of the General Public of the State of California,<br><br>17                 Plaintiffs,<br><br>18  v.<br><br>19  CIBA-GEIGY CORP. USA; NOVARTIS PHARMACEUTICALS CORP.; CHILDREN AND ADULTS WITH ATTENTION DEFICIT/HYPERACTIVITY DISORDER (CHADD); AMERICAN PSYCHIATRIC ASSOCIATION, and DOES 1 through 100, inclusive,<br><br>23                 Defendants. | ) **CASE NO. 00 CV 1839 B (CGA)**<br>)<br>) **MEMORANDUM OF POINTS AND**<br>) **AUTHORITIES IN SUPPORT OF**<br>) **DEFENDANT AMERICAN PSYCHIATRIC**<br>) **ASSOCIATION'S SPECIAL MOTION TO**<br>) **STRIKE FIRST AMENDED COMPLAINT**<br>)<br>) **Date:          March 5, 2001**<br>) **Time:          10:30 a.m.**<br>) **Courtroom:   2**<br>)<br>) **I/C JUDGE: Hon. Rudi M. Brewster**<br>)<br>)<br>)<br>)<br>) |

24

25

26

27

28

**ORIGINAL**

00CV1839 B (CGA)

# **TABLE OF CONTENTS**

**Page**

INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

I.    PLAINTIFF'S CLAIMS AGAINST THE APA ARISE OUT OF SPEECH AND
      CONDUCT PROTECTED BY THE FIRST AMENDMENT AND CCP § 425.16 . . . . .  12

      A.    The APA's Publication of the DSM Constitutes Free Speech in
            Connection with an Issue of Public Interest Within CCP § 425.16(e)(4).  . . . . . .  13

      B.    The APA's Collaborative Activities with the WHO and Other Federal
            Agencies in Developing the Diagnostic Criteria in the DSM Involves
            Conduct in Furtherance of the Exercise of the Right of Petition Within
            CCP § 425.16(e)(4).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      C.    The Development of the Diagnoses of ADD and ADHD Set Forth in the
            DSM Involves Statements Made Before, and in Connection with an Issue
            under Consideration by Governmental Bodies Within CCP
            § 425.16(e)(1) & (2).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      D.    The Development of the Diagnoses of ADD and ADHD in the DSM
            Involve Statements Made in a Public Forum in Connection with an Issue of
            Public Interest Within CCP § 425.16(e)(3).  . . . . . . . . . . . . . . . . . . . . . . . .  20

II.   PLAINTIFF CANNOT ESTABLISH A PROBABILITY OF SUCCESS
      ON THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Board of Trustees v. Sullivan,*
    773 F. Supp. 472 (D.D.C. 1991) ................................................................................... 15

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) ................................................................................................... 13

*Branch v. Tunnell,*
    14 F.3d 449 (9th Cir. 1994) ........................................................................................ 4

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................................................... 21

*Freyd v. Whitfield,*
    972 F. Supp. 940 (D. Md. 1997) ................................................................................. 15

*In re Silicon Graphics Inc. Security Litigation,*
    183 F.3d 970 (9th Cir. 1999) ...................................................................................... 4

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ..................................................................................... 15

*United States v. Lockheed Missiles & Space Co., Inc.*
    190 F.3d 963 (9th Cir. 1999) ............................................................................... 10, 11

*Metabolife International, Inc. v. Wornick,*
    72 F. Supp. 2d 1160 (S.D. Cal. 1999) .................................................................. passim

*Miller v. California,*
    413 U.S. 15 (1973) ..................................................................................................... 15

*Nicosia v. De Rooy,*
    72 F. Supp. 2d 1093 (N.D. Cal. 1999) ....................................................................... 11

*Rogers v. Home Shopping Network, Inc.,*
    57 F. Supp. 2d 973 (C.D. Cal. 1999) ......................................................................... 11

*Underwager v. Salter,*
    22 F.3d 730 (7th Cir. 1994) ....................................................................................... 13

*United States v. Cantu,*
    12 F.3d 1506 (9th Cir. 1993) ................................................................................. 2, 16

PKNS 283681.1

*United States v. Johnson,*
    979 F.2d 396 (6th Cir. 1992) .................................................................. 2

*United States v. Murdoch,*
    98 F.3d 472 (9th Cir. 1996) ............................................................... 2, 16

*United States v. U.S. District Court for Central District of California,*
    858 F.2d 534 (9th Cir. 1988) ................................................................. 14

*Washington Legal Foundation v. Friedman,*
    13 F. Supp. 2d 51 (D.D.C . 1998), *amended,* 36 F. Supp. 2d 16 (D.D.C.
    1999), *vacated on other grounds* 202 F.3d 331 (D.C. Cir. 2000) ...................... 15

## STATE CASES

*Averill v. Superior Court,*
    42 Cal. App. 4th 1170 (1996) ................................................................ 10

*Beilenson v. Superior Court,*
    44 Cal. App. 4th 944 (1996) ............................................................ 21, 22

*Bradbury v. Superior Court,*
    49 Cal. App. 4th 1108 (1996) ................................................................ 22

*Briggs v. Eden Council for Hope and Opportunity,*
    19 Cal. 4th 1106 (1999) ..................................................................... 9, 19

*Church of Scientology, supra,*
    42 Cal. App. 4th 628-55 ...................................................................... 22

*Church of Scientology v. Wollersheim,*
    42 Cal. App. 4th 628 (1996) ................................................................. 21

*Damon v. Ocean Hills Journalism Club*
    85 Cal. App. 4th 468, 102 Cal. Rptr. 2d 205 (2000) ................................... 20

*Dixon v. Superior Court,*
    30 Cal. App. 4th 733 (1994) ................................................................. 22

*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,*
    47 Cal. App. 4th 777 (1996) ................................................................. 22

*DuPont Merck Pharm. Co. v. Superior Court,*
    78 Cal. App. 4th 562 (2000) ......................................................... 9, 13, 14

*Evans v. Unkow,*
    38 Cal. App. 4th 1490 (1995) .................................................................................. 21

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,*
    37 Cal. App. 4th 855 (1995) .................................................................................. 22

*Ludwig v. Superior Court,*
    37 Cal. App. 4th 8 (1995) .............................................................................. 14, 22

*Macias v. Hartwell, ,*
    55 Cal. App. 4th 669 (1997) .................................................................................. 21

*Matson v. Devorak,*
    40 Cal. App. 4th 539 (1995) .................................................................................. 22

*People v. Ward,*
    71 Cal. App. 4th 368 (1999) .................................................................................... 2

*Robertson v. Rodriguez,*
    36 Cal. App. 4th 347 (1995) .................................................................................. 22

*Wilcox v. Superior Court,*
    27 Cal. App. 4th 809 (1994) ...................................................................... 10, 21, 22

*Wilson v. Superior Court,*
    13 Cal. 3d 652 (1975) .................................................................................... 15, 17

## DOCKETED CASES

*Garrison v. Baker,*
    No. 98-17038, 2000 WL 206575 (9th Cir. Feb. 23, 2000) ................................... 20

## REGULATIONS

California Code of Regulations tit. 9
    Sections 1774(a)(1) & (a)(1)(B), 1820.205(a)(1)(B), 1830.205(b)(1)(B)
    (App., Exh. 10) ........................................................................................................ 6

32 Code of Federal Regulations
    Section 199.2 (App., Exh. 13) .................................................................................. 7

Federal Rule of Civil Procedure
    12(b)(6) .................................................................................................................. 11
    201 ........................................................................................................................... 4

iv

1

## STATE STATUTES

2

California Business & Professions Code
     Section 17200 ................................................................................................................... 8

California Civil Code
     Section 1750. ................................................................................................................... 8

California Education Code
     Section 56339 ................................................................................................................... 6

California Health & Safety Code
     Section 1374.72 ................................................................................................................ 6

California Insurance Code
     Section 10144.5 ................................................................................................................ 6

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTORY STATEMENT**

With the Amended Complaint, Plaintiff seeks to represent a statewide class of consumers in a massive fraud lawsuit against (among others) the American Psychiatric Association ("APA"), a scientific and educational organization of more than 40,000 members worldwide. The crux of the Amended Complaint against the APA is that – through its development and publication of a medical treatise, "the Diagnostic and Statistical Manual of Mental Disorders (DSM)" (Amended Complaint ¶ 15), which recognized the diagnoses of Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD) – the APA and the other Defendants have "planned, conspired, and colluded to develop, promote, broaden and confirm the diagnoses of [ADD and ADHD]." *Id.* The nub of Plaintiff's claim appears to be that, with its development and publication of the DSM, the APA allegedly broadened the diagnostic criteria for these mental disorders in order to create a market for and promote the drug, Ritalin, which is one of the treatments for ADD and ADHD.

Leaving aside the fundamental implausibility of Plaintiff's conspiracy theory, the critical failing of the Amended Complaint for purposes of this motion is that it is a direct assault on speech and conduct that lie at the heart of the First Amendment and are protected by the anti-SLAPP statute. For, at bottom, Plaintiff is asking this Court to hold a nonprofit educational and scientific association liable in damages for developing and publishing a book about unquestionably important public health issues. Even with an opportunity to amend the Complaint,[1] Plaintiff's lawsuit remains centrally based on a challenge to the APA's written statements about ADD and ADHD in the DSM. For example, the Amended Complaint now alleges that, in its publication of the DSM, the APA "has improperly *failed to address or include dissenting opinion* and *failed to fully address* or actually obscured the scientific literature that advances *the position* that the diagnosis of ADD is properly made only as a diagnosis of exclusion.

---

[1] According to Plaintiff's Motion for Leave to File the Amended Complaint, the revisions contained in this new pleading were purportedly designed to address the arguments raised in the APA's original Special Motion to Strike. *See* Memorandum in Support of Plaintiff's Motion for an Order Granting Leave to File First Amended Complaint (filed on January 17, 2001) at 3. Yet, they merely seem to confirm that the SLAPP statute applies to this case.

1  a *view* emphasized by the American Academy of Child and Adolescent Psychiatry... ."  ¶ 26

2  (emphasis added).  Plaintiff is effectively inviting the Court to police the national and international

3  scientific debate surrounding a mental health issue of great public importance and to decide which

4  scientific opinions are fit to be printed and which are not.  Moreover, according to his Prayer for

5  Relief, Plaintiff would also have this Court enter an unprecedented declaratory and injunctive

6  order – essentially, an unlawful "prior restraint" – "to halt" certain allegedly "unlawful methods,

7  acts and practices," apparently including the APA's promulgation of the diagnoses of ADD and

8  ADHD in the DSM.  (Prayer for Relief ¶ 1(a).)  The First Amendment will not tolerate this.

9      And it is not just the preparation of an important medical treatise, and the freedom of the

10  related scientific debate, that will be thwarted or chilled if this lawsuit is allowed to proceed, as

11  fundamental as these things are in themselves.  Core "petitioning activities" by the APA are also at

12  issue.  In its development and promulgation of diagnostic criteria relating to mental illness, the

13  APA routinely collaborates with numerous federal agencies – which, in turn, rely on the DSM's

14  classification and diagnostic criteria – as well as with the World Health Organization.  Indeed, the

15  APA's collaboration with the federal government in developing DSM categories is, in certain

16  circumstances, pursuant to the United States' international treaty obligations to establish

17  classification schemes and to report disease statistics in a manner consistent with the World Health

18  Organization's own *International Classification of Diseases* ("ICD").  And it is not just legislative

19  and executive bodies that have recognized the APA's scientific expertise in this regard.  Judicial

20  bodies, too, have come to rely upon the scientific validity and integrity of the APA's diagnostic

21  classifications and criteria as embodied in the DSM, frequently taking judicial notice of the

22  psychiatric diagnoses contained in it.[2]

23      Against this background, there can be no doubt that Plaintiff's claims against the APA in

24  this lawsuit arise from conduct "in furtherance of the [APA's] right of petition or free speech under

25

26

27      [2] *See, e.g., United States v. Cantu*, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993) (taking judicial notice that a condition listed in the DSM is a recognizable psychiatric condition); *United States v. Murdoch*, 98 F.3d 472, 479 (9th Cir. 1996) (Wilson, J. concurring) (taking judicial notice of the

28  diagnostic standards in the DSM).  *Accord, United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1992); *People v. Ward*, 71 Cal. App. 4th 368, 372 & n.3 (1999).

        2

the United States or California Constitution in connection with a public issue," as defined by Section 425.16. The publication of the DSM by the APA is core First Amendment speech, as is the scientific debate surrounding that publication. Similarly, the APA's efforts to educate state, national and international governmental bodies about its diagnostic categories and criteria is clearly protected petitioning activity. And finally, there is no dispute that the current scientific and political debate over ADD and ADHD as public health problems presents an issue of "public importance." In short, all of the statutory criteria under Section 425.16 are met.[3] Indeed, this Court has recently applied the anti-SLAPP statute to a scientific controversy over the safety of a product in far less compelling factual circumstances than presented here. *See Metabolife Int'l, Inc. v. Wornick,* 72 F. Supp. 2d 1160 (S.D. Cal. 1999).

The APA does not quarrel with the right of this Plaintiff or other interested persons to criticize or debate the APA's diagnostic categories or criteria as reflected in the DSM. The question is what is the appropriate forum for such a discussion. We respectfully submit that, under our constitutional scheme and the more specific protections of Section 425.16, private civil litigation is not the right answer, at least not until such time as a Plaintiff is able to make a showing of fraud far more substantial and specific than the wholly conclusory allegations presented by the Amended Complaint. As this Court observed in *Metabolife,* "scientific controversies 'must be settled by methods of science rather than by methods of litigation.'" 72 F. Supp. 2d at 1172 (quoting *Underwager v. Salter,* 22 F. 3d 730, 736 (7th Cir. 1994)). What a free democracy requires in such circumstances is "'[m]ore papers, more discussion, better data, and more satisfactory models – not larger awards of damages . . . .'" *Id.*

---

[3] CCP § 425.16 is designed to ensure early exposure and dismissal of meritless complaints that implicate fundamental First Amendment rights. Once the movant establishes that a complaint falls within the statutory definition of a "SLAPP" suit, subsection (b) of CCP § 425.16 requires that the complaint be stricken unless plaintiff can establish a reasonable probability of prevailing on the merits at trial. Importantly, in responding to such a motion, a plaintiff is *not* entitled to rely simply on the allegations in his pleading, but must come forward with admissible evidence sufficient both to support his claims and overcome the constitutional defenses asserted by the movant. Subsection (b)(2) of CCP § 425.16 makes clear that in assessing the sufficiency of Plaintiff's showing in response to a motion to strike under the statute, the Court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

1  Accordingly, and for the reasons set forth more fully below, the APA has established a

2  *prima facie* case that Section 425.16 applies.  The Amended Complaint should be stricken unless

3  the Plaintiff can now come forward with "admissible evidence" showing "a probability that the

4  Plaintiff will prevail on the claim."  CCP § 425.16(b)(1).

5  **BACKGROUND**

6  The facts pertinent to this motion – which include allegations taken from the Amended

7  Complaint and matters as to which the Court may properly take judicial notice[4] – are:

8  1.  Founded in 1844, the APA is the nation's oldest medical society.  It consists of

9  more than 40,000 members worldwide.  The APA and its members are dedicated to the

10  advancement of knowledge, education and research in the field of psychiatry as well as to

11  improvement of the diagnosis and treatment of the mentally ill.  The APA is organized as a

12  nonprofit corporation with its principal place of business in Washington, D.C.  Amended

13  Complaint ¶ 10.

14  2.  As an integral part of its mission, the APA publishes the *Diagnostic and Statistical*

15  *Manual of Mental Disorders* ("DSM"), a classification and glossary of mental disorders used to

16  provide a common language for clinicians and research investigators to communicate regarding

17  the disorders for which they have professional responsibility.  Amended Complaint ¶¶ 15, 17.  The

18  DSM was first published by the APA in 1952.  Since then, the APA has published four revised

19  editions of the DSM:  (a) DSM-II (1968); (b) DSM-III (1980); (c) DSM-III-R (1987); and (d)

20  DSM-IV (1994).  (Relevant excerpts from these editions of the DSM are Exhibits 1-5 of the

21  Appendix.)[5]

22

23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[4] The APA submits herewith a Request for Judicial Notice Pursuant to Fed. R. Evid. 201,

25  with supporting Declarations from Claire E. Reinburg and Sarah C. Lindsey and Notice of
Lodgment of Appendix of Exhibits (hereinafter "App.").

26

27  [5] Because the DSM is specifically referred to in the Amended Complaint (¶¶ 15, 17), it
may properly be considered by the Court in ruling upon a motion directed to the pleadings, such as

28  this one.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

3.     The publication of each edition of the DSM represents the culmination of years of study within the APA and the broader mental health community, including clinical studies, literature reviews, and working group deliberations regarding diagnostic criteria by experts in both the private sector and government.  Reflecting the "evolving" nature of the scientific method, the DSM authors observed that "[a]s medical science advances, a nomenclature must expand to include new terms necessary to record new observations."  DSM-I at 88.  The DSM's terminology and concepts have been widely adopted by clinicians and academicians both in the United States and internationally, having been translated into more than twelve foreign languages.  DSM-III-R at xviii (Intro.).  Despite DSM's widespread use as a diagnostic tool, it contains no treatment recommendations.  Rather, the APA cautions in the Introduction to the DSM that its diagnostic criteria should "not be applied mechanically by untrained individuals [, but] are meant to serve as guidelines to be informed by clinical judgment[.]"  DSM-IV at xxiii.

4.     Over the years, the APA has worked jointly with the World Health Organization ("WHO"), which publishes the international counterpart to the DSM, the *International Classification of Diseases* ("ICD").  Thus, as the APA published DSMs II through IV, it periodically collaborated with the WHO to try to develop consistency between the DSM and the ICD, as well as with the National Institute of Mental Health ("NIMH") of the U.S. Department of Health and Human Services ("HHS"), and the Alcohol, Drug Abuse and Mental Health Administration ("ADAMHA") of the Public Health Service of HHS, and a broad range of practitioners, interested medical specialty societies, clinicians, scientists, and other researchers in the mental health field.  DSM-II at xii-xv (Foreword);  DSM-III at 1-5 (Intro.); DSM-III-R at xvii-xix (Intro.); DSM-IV at xv-xxi (Intro.).

5.     The collaboration between the APA and the U.S. Government in developing DSM categories reflects the United States' obligation under an international treaty to publish and code national death and morbidity statistics in a manner that is consistent with ICD categories.  *See* World Health Organization:  Nomenclature Regulations, May 22, 1967, T.I.A.S. No. 6393, at art. 3 (App., Exh. 8); Constitution of the World Health Organizations, July 22, 1946, 62 Stat. 2679,

T.I.A.S. No. 1808, at arts. 2(s), 21(b), 22 and 64 (App., Exh. 9); ICD-9-CM at xiii-xv (App., Exh. 7).

6.     The DSM-III formally classified Attention Deficit Disorder ("ADD") in 1980, although the disorder has long been recognized under other names.[6] The DSM-III listed "Attention Deficit Disorder" in the section on "Infancy, Childhood, or Adolescent Disorders," with signs of "developmentally inappropriate inattention and impulsivity" as its essential feature. Two subtypes were identified – ADD "with hyperactivity" and ADD "without hyperactivity." DSM-III at 41-44. As with all disorders listed in DSM-III, specific diagnostic criteria were provided as guides for making each diagnosis. DSM-III-R at 8 (Intro.), 41-44.

7.     The APA's DSM is not the only authoritative medical treatise to recognize ADD and ADHD as disorders. For example, the ICD-9-CM – which is the official system in the United States for "reporting diagnoses and diseases to all U.S. Public Health Service and Health Care Financing Administration programs" (ICD-9-CM at iii) – also classifies both ADD and ADHD as mental disorders.

8.     California substantive law expressly recognizes ADD and ADHD as mental disorders, frequently incorporating the DSM's diagnostic criteria. Thus, by way of example, California's MediCal program provides Medicaid coverage for "Attention Deficit Disorders," as diagnosed "in the Diagnostic and Statistical Manual, Fourth Edition, published by the American Psychiatric Association[.]" Cal. Code Regs. tit. 9, §§ 1774(a)(1) & (a)(1)(B), 1820.205(a)(1)(B), 1830.205(b)(1)(B) (App., Exh. 10).[7] Correspondingly, the federal government has also engrafted

---

[6]DSM-II (1968) recognized a disorder known as "hyperkinetic reaction of childhood" which was "characterized by overactivity, restlessness, distractibility, and short attention span... ." DSM-II at 50. Subsequent to publication of DSM-II, ICD-9 (published by the WHO in 1975 (App., Exh. 6)) and ICD-9-CM (an adapted version of ICD-9 published by HHS for use in the U.S.) classify "hyperkinetic syndrome of childhood" and "attention deficit disorder without mention of hyperactivity/with hyperactivity," respectively.

[7] *See also* 22 CCR § 80001(m)(1) (defining "Mental Disorders," in part, as "any of the disorders set forth in the Diagnostic and Statistical Manual of Mental Disorders (Third Edition) of the American Psychiatric Association") (App., Exh. 11); Cal. Educ. Code § 56339 (providing "special education and related services" to pupils who, among other things, are "suspected [of having] or diagnosed [with] . . . attention deficit disorder or attention deficit hyperactivity disorder") (App., Exh. 12); Cal. Health & Safety Code § 1374.72 (requiring health plans to provide coverage for necessary treatment of "serious emotional disturbances of a child," defined to include "one or more mental disorders as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders") (App., Exh. 17); Cal. Ins. Code § 10144.5

the DSM into its positive law. For instance, the CHAMPUS program, which provides medical benefits to the civilian family members of military personnel, defines its mental health coverage, in part, in terms of the DSM. *See* 32 CFR § 199.2 (App., Exh. 13). *See also Medicare Comprehensive Outpatient Rehabilitation Facility and Community Mental Health Center Manual* § 260.5 at 2-75 (as revised by Transmittal 14, Sept. 15, 2000) (limiting eligibility for certain partial hospitalization coverage under the Medicare program to certain conditions as "defined by the current edition of the Diagnostic and Statistical Manual published by the American Psychiatric Association . . . .") (App., Exh. 14).

9.    Apart from the ongoing dialogue within the professional field, the diagnosis and treatment of children with ADD/ADHD has drawn attention on the broader national stage, including, for example, hearings before the United States Congress.[8] In short, the diagnosis and treatment of children suffering from the behavioral symptoms associated with the ADD/ADHD diagnoses are "public" issues – the open and free-flowing discussion of which within the scientific and professional mental health field is critical to enhancing the understanding of the disorder. The DSM reflects the current medical evidence and scientific consensus which support that understanding, and contributes significantly to its further development.

10.    The original Complaint was filed on September 13, 2000. Because the Complaint was directed at the APA's protected First Amendment activities, the APA filed an anti-SLAPP motion on November 21, 2000. The other Defendants also filed motions to strike. Recognizing that the Defendants' Motions to Strike were "potentially dispositive motions," Plaintiff was "forced to examine his causes of action and the facts supporting them," and requested leave to file an amended complaint. Memorandum in Support of Plaintiff's Motion For An Order Granting Leave to File First Amended Complaint at 2, 3. Plaintiff also sought a continuance of the

_____

(implementing similar requirement with respect to disability insurance policies) (App., Exh. 18).

[8]*See, e.g.,* 146 Cong. Rec. D475 (daily ed. May 16, 2000) (referencing House of Representatives Committee on Education and Workforce meeting regarding "Ritalin Use Among Youth") (App., Exh. 15); 104 Cong. Rec. D746 (daily ed. July 16, 1996) (referencing House of Representatives Committee on Government Reform and Oversight meeting regarding "Oversight – Attention Deficit/Hyperactivity Disorder") (App., Exh. 16).

1   February 5, 2001 hearing on Defendants' anti-SLAPP motions.  The APA and the other

2   Defendants subsequently stipulated to the filing of the First Amended Complaint.  In an order

3   entered January 25, 2001, this Court granted Plaintiff leave to file his Amended Complaint and

4   ordered the Defendant to file renewed anti-SLAPP motions directed to the Amended Complaint.

5        11.     Plaintiff is a minor who alleges that he "was prescribed, and purchased and

6   ingested, the drug Ritalin in June, 1994, when he was nine years of age."  Amended Complaint

7   ¶ 6.  He has brought this putative class action on behalf of himself and "all California residents

8   who purchased and/or ingested the drug Ritalin for treatment of ADD/ADHD."  *Id.* ¶ 44.  The

9   Amended Complaint names as Defendants (a) the manufacturer of Ritalin (formerly Ciba-Geigy

10  Corp. USA, which, as a result of merger, is now Novartis Pharmaceuticals Corp.) (Amended

11  Complaint ¶¶ 7-8); (b) an association of adults and children with ADD or ADHD known by the

12  acronym CHADD (*id.* ¶ 9); and (c) the APA (*id.* ¶ 10).

13       12.     The crux of the Plaintiff's claim is summarized in Paragraph 15 of the Amended

14  Complaint:

15          Ciba/Novartis, in combination with the American Psychiatric Association
            (APA), planned, conspired, and colluded to develop, promote, broaden and
16          confirm the diagnoses of Attention Deficit Disorder (ADD) and Attention
            Deficit Hyperactivity Disorder (ADHD) in a highly successful effort to
17          increase the market for its product Ritalin.  Previously recognized in a much
            more narrow fashion and under another name, Attention Deficit Disorder
18          was first listed in the Diagnostic and Statistical Manual of Mental Disorders
            (DSM) in 1980.  ADD was further and inappropriately broadened in 1987
19          when it became known as ADHD.

20  Plaintiff apparently alleges that the APA was induced to enter into this conspiracy through

21  unspecified "financial relationships" between "Ciba/Novartis and APA."  Amended Complaint

22  ¶ 16.  However, no specific allegations can be found in the Amended Complaint as to how, when,

23  where and through the actions of what individual people this remarkable conspiracy was hatched

24  and executed.

25       13.     Plaintiff asserts three claims for relief under state law.  The first is for violation of

26  California's Consumer Legal Remedies Act (Calif. Civil Code §§ 1750 *et seq.*).  The second is for

27  unfair competition under California Business & Professions Code § 17200.  The third is for

28  "inducement through false and misleading statement" under California Business & Professions

Code § 17500. In addition to compensatory and exemplary damages, Plaintiff asks this Court for "injunctive and declaratory relief" "to halt" certain allegedly "unlawful methods, acts and practices." (Prayer for Relief ¶ 1(a)), apparently including the APA's publication of diagnoses in the DSM.

## ARGUMENT

Recognizing "the public interest to encourage continued participation in matters of public significance . . . and [finding] that this participation should not be chilled through abuse of the judicial process," *Metabolife Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999), the California Legislature passed the "anti-SLAPP" statute, CCP § 425.16, which is designed to impede "strategic lawsuits against public participation" ("SLAPP" suits). The anti-SLAPP statute "provides a mechanism for a defendant to strike civil actions brought primarily to chill the exercise of free speech." *Metabolife*, 72 F. Supp. 2d at 1165. Specifically, the statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." CCP § 425.16(b)(1).

As the statute states, it is available to any "person," which includes corporations such as the APA. *See, e.g., DuPont Merck Pharm. Co. v. Superior Court*, 78 Cal. App. 4th 562 (2000) (defendant was pharmaceutical company); *Metabolife*, 72 F. Supp. 2d 1160 (television station); *Briggs v. Eden Council for Hope and Opportunity*, 19 Cal. 4th 1106 (1999) (nonprofit corporation). The statute is available to strike "any cause of action" that meets its requirements. In *DuPont Merck*, for example, the court applied the statute to two of the causes of action involved here – the Consumer Legal Remedies Act and the California Unfair Practices Act. 78 Cal. App. 4th at 564.

The anti-SLAPP statute defines protected First Amendment activities to include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest;

(4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

CCP § 425.16(e).[9]

A movant seeking to strike a cause of action under the anti-SLAPP statute bears the initial burden of establishing the statute's applicability. *See Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 819 (1994). Once a movant has met this burden, "[t]he burden then shifts to the SLAPP plaintiff to establish by 'reasonable probability' that the [SLAPP] plaintiff will prevail on the claim and that the [citizen party's] 'purported constitutional defenses are not applicable to the case as a matter of law or by a *prima facie* showing of facts which, if accepted by the trier of fact, would negate such defenses.'" *United States v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d at 971 (quoting *Wilcox*, 27 Cal. App. 4th at 824); *see also* Plaintiff's Notice of Motion and Motion for An Order Granting Leave to File First Amended Complaint at 2 (acknowledging that if Defendants have demonstrated that "Plaintiff's allegations as to Defendant's activities fit within the scope of the statute, then Plaintiff must put on evidence establishing a *prima facie* case that he would prevail on the merits at trial"). "The Defendant's anti-SLAPP motion should be granted, therefore, when the Plaintiff presents an insufficient legal basis for the claims or 'when no

_____

[9] Consistent with the Legislature's intent that the statute be "construed broadly" (CCP § 425.16(a)), this list of activities is illustrative, not all-inclusive. *See Averill v. Superior Court*, 42 Cal. App. 4th 1170, 1175 (1996) ("The use of 'includes' implies that other acts which are not mentioned are also protected under the statute.").

evidence of sufficient substantiality exists to support a judgment for the plaintiff." *Metabolife*, 72 F. Supp. 2d at 1165 (quoting *Wilcox*, 27 Cal. App. 4th at 828)).[10]

## I. PLAINTIFF'S CLAIMS AGAINST THE APA ARISE OUT OF SPEECH AND CONDUCT PROTECTED BY THE FIRST AMENDMENT AND CCP § 425.16.

Plaintiff's Amended Complaint is centered upon the remarkable allegation that the APA, in combination with the other Defendants, "planned, conspired, and colluded to develop, promote, broaden and confirm the diagnoses of [ADD] and [ADHD] in a highly successful effort to increase the market for its product Ritalin," and that the APA effected this grand conspiracy through the publication of the DSM. Amended Complaint ¶ 15. Blithely ignoring the indisputable public facts that each edition of the DSM represents the culmination of years of wide-ranging scientific discourse – involving the participation of numerous international health organizations (such as the WHO), federal agencies (such as NIMH), prominent medical and scientific associations (such as the AMA and the National Academy of Sciences), and public and private universities – the Amended Complaint alleges in wholly conclusory terms that the APA and the other Defendants simply made up or improperly broadened the descriptions of these mental disorders. And, on the basis of this vague allegation, Plaintiff seeks not only compensatory and exemplary damages, but also injunctive and declaratory relief "to halt" the APA from publishing the DSM.

As we demonstrate below, however, the publication of an important medical treatise, and the robust scientific discourse that surrounds it, are activities that have long enjoyed First Amendment protection. As such, these activities fall squarely within the scope of Section 425.16.

---

[10]The present motion to strike is premised on the legal deficiencies inherent in the Amended Complaint, analogous to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Lockheed, supra,* 190 F. 3d 963, 971 (9th Cir. 1999) (a motion to strike under § 425.16 is "akin to a motion to dismiss"). *See also Nicosia v. De Rooy,* 72 F. Supp. 2d 1093, 1110-11 (N.D. Cal. 1999). Because the motion is directed to the legal sufficiency of the plaintiff's claims, no discovery or other factual development is necessary to resolve this motion. *See Rogers v. Home Shopping Network, Inc.,* 57 F. Supp. 2d 973, 983 (C.D. Cal. 1999).

The mere filing – let alone active litigation – of this Amended Complaint threatens to chill these important First Amendment activities.  Since the fundamental purpose of the anti-SLAPP statute is, as this Court has held, "[t]o ensure that participation in public debate is not 'chilled'" by establishing "a procedure for early dismissal of meritless lawsuits against public speech" (*Metabolife*, 72 F. Supp. 2d at 1165), Plaintiff should not be entitled to proceed with his extraordinary lawsuit until he can overcome the protections afforded by CCP § 425.16.

### A.    The APA's Publication of the DSM Constitutes Free Speech in Connection with an Issue of Public Interest Within CCP § 425.16(e)(4).

The Amended Complaint makes two core allegations against the APA which, taken together, fall squarely within the anti-SLAPP statute's protection of "the constitutional right of free speech in connection with a public issue or an issue of public interest."  CCP § 425.16(e)(4). First, the central activity of the APA upon which Plaintiff seeks to establish the APA's liability is its preparation and publication of the DSM.  Amended Complaint ¶ 15, 17-26.  Second, Plaintiff acknowledges, as he must, that the DSM is "a widely used and disseminated compendium of psychiatric diagnoses" and that its publication generates "great ***public attention***."  *Id.* ¶ 17 (emphasis added).  These two allegations by themselves are a sufficient basis for application of the anti-SLAPP statute to this case because they establish, under subsection (e)(4), that Plaintiff's claims arise out of "free speech" about a "public issue" or matter of "public interest."

Directly on point in this regard is this Court's recent decision in *Metabolife*, 72 F. Supp. 2d 1160.  In that case, plaintiff Metabolife International, Inc., a manufacturer of herbal dietary supplements, sued a television station, one of its reporters, and a scientist (Dr. Blackburn), all of whom participated in preparing and broadcasting an investigative series of news reports about Metabolife's primary product, Metabolife 356.  The gist of the complaint was that the defendants made defamatory statements about the safety of Metabolife's product during these broadcasts.  In

1  response to the complaint, defendants filed a motion to strike pursuant to CCP § 425.16,

2  contending that the lawsuit arose out of conduct protected by the First Amendment and that it

3
4  should therefore be dismissed pursuant to the statute unless Metabolife could adduce admissible

5  evidence demonstrating a reasonable probability of prevailing on its claim.

6      This Court in *Metabolife* granted the defendants' anti-SLAPP motion and dismissed the

7  case with prejudice. 72 F. Supp. 2d at 1176. In reaching this conclusion, the Court held that the

8  defendants' alleged conduct – disseminating scientific opinions about a public health issue – was

9
10  squarely protected under the First Amendment, and under Section 425.16, as free speech

11  concerning a matter of public importance. Relying on a line of Supreme Court decisions

12  stemming from *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984), the Court

13  noted that

14          Dr. Blackburn's statements are protected by the First Amendment as a
15          "rational interpretation" of the complex and unresolved scientific debate
            concerning the safety of ephedrine-based diet pills like Metabolife 356.
16          Because the safety of Metabolife 356 remains an open question of
            substantial public importance, contributions to the debate are protected
17          by the First Amendment. If a consensus is ultimately reached that the
18          product is safe, Metabolife may have been an unintended victim of the
            Constitution's ardent free speech protections. We risk such results in
19          order to foster a public forum for the robust debate that identifies
            scientific truths.
20
21  72 F. Supp. 2d at 1172. The Court concluded by quoting Judge Easterbrook's observation in

22  *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) that scientific controversies "'must be

23  settled by the methods of science rather than by methods of litigation" and that "[m]ore papers,

24  more discussion, better data, and more satisfactory models – not larger awards of damages – mark

25
26  the path toward superior understanding of the world around us." *Id.*

27      Equally instructive is the California Fourth District Court of Appeals' decision in *DuPont*

28  *Merck Pharm. Co. v. Superior Court*, 78 Cal. App. 4th 562 (2000). In *DuPont Merck*, a putative

class of purchasers of an anti-coagulant drug (Coumadin) sued its manufacturer (DuPont Merck)

under the California Consumers Legal Remedies Act and the California Unfair Practices Act – two

of the statutes invoked by Plaintiff here – for making allegedly false and misleading statements

about an equivalent generic drug.  The plaintiffs in that case alleged that DuPont Merck "published

and disseminated false and misleading information to the public regarding the generic form" of the

drug and misled the FDA.  78 Cal. App. 4th at 564.   DuPont Merck filed a motion to dismiss

pursuant to the anti-SLAPP statute, which the trial court denied.  On appeal, however, the Fourth

District reversed, concluding that even DuPont Merck's "advertising, marketing, and public

relations activities directed at the medical profession and the general public" (78 Cal. App. 4th at

566) qualified for protection under the statute since these activities involved free speech about an

issue "of public interest." *Id.* at 567.[11]

If anything, the allegations against the APA in this case present an even more compelling

example for application of the anti-SLAPP statute than either *Metabolife* or *DuPont Merck* since

this case involves the core First Amendment activities of a nonprofit association dedicated to the

advancement of medical science.  The case law has long recognized that "scientific expression and

debate" lie at the "***heartland***" of the First Amendment.  *United States v. U.S. District Court for

Central District of California*, 858 F.2d 534, 542 (9th Cir. 1988) (emphasis added).  Indeed, as the

United States Supreme Court has stated, "[t]he First Amendment protects works which, taken as a

whole, have serious literary, artistic, political, or *scientific value, regardless of whether the*

---

[11] *DuPont Merck* makes clear that, even if a party engages in protected activity for
purposes of making money, that fact alone will not remove the case from the scope of the statute.
Thus, in this case, it is of no consequence that Plaintiff alleges that the APA "maintained financial
relationships with" the pharmaceutical industry.  *See also Ludwig v. Superior Court*, 37 Cal. App.
4th 8, 15 (1995) ("The statute is appropriately applied to litigation involving conduct by a
defendant which was directed to obtaining a financial advantage.").

*government or a majority of the people approve of the ideas these works represent." Miller v. California,* 413 U.S. 15, 34 (1973) (emphasis added).

Scientific treatises like the DSM merit particularly heightened protection. As one court noted: "peer-reviewed medical journal articles and commercially-available medical textbooks merit *the highest degree of constitutional protection*" for the simple reason that "[s]cientific and academic speech reside *at the core of the First Amendment*." *Washington Legal Found. v. Friedman,* 13 F. Supp. 2d 51, 62 (D.D.C . 1998) (emphasis added), *amended,* 36 F. Supp. 2d 16 (D.D.C. 1999), *vacated on other grounds,* 202 F.3d 331 (D.C. Cir. 2000). *See also Junger v. Daley,* 209 F.3d 481, 484 (6th Cir. 2000) ("The Supreme Court has explained that 'all ideas having even the slightest redeeming social importance,' including those concerning 'the advancement of truth, *science*, morality, and arts' have the full protection of the First Amendment.") (emphasis added); *Board of Trustees v. Sullivan,* 773 F. Supp. 472, 474 (D.D.C. 1991) ("It is equally settled, however, though less commonly the subject of litigation, that the First Amendment protects *scientific expression and debate* just as it protects political and artistic expression.") (emphasis added).[12] The reasons for this heightened protection are plain: "scientific discourse in this country perseveres because of our 'profound national commitment to the principle that debate on public issues should be uninhibited.' . . . [a] rule requiring scientists and authors to guarantee the 'truth' of their hypotheses would inevitably lead to self-censorship and would stifle the very debate that leads to scientific knowledge." *Freyd v. Whitfield,* 972 F. Supp. 940, 945 (D. Md. 1997).

The APA's development and publication of the DSM has enabled physicians, clinicians and research investigators worldwide to communicate in a common language regarding the mental

---

[12] Moreover, California's analogous constitutional provision is, if anything, more protective of "free speech" rights. *See Wilson v. Superior Court,* 13 Cal. 3d 652 (1975) ("A protective provision more definitive and inclusive is contained in our state constitutional guarantee of the right of free speech and press").

disorders for which they have professional responsibility. The DSM's authority within the mental health community is derived from its longstanding ability to accurately reflect the current consensus of scientific knowledge regarding mental disorders in the ongoing, and ever-changing discourse of science. In light of this ability, the DSM has, in turn, earned recognition outside the medical community, including that of federal and state legislative and administrative bodies, not to mention courts within this federal judicial circuit.[13]

Science, of course, does not stand still, particularly in as complex a field as psychiatry.[14] The APA recognizes that controversies will, from time to time, arise over the exact nature and dimensions of mental illnesses and disorders. We certainly do not contend that, merely because the DSM is an authoritative source of current psychiatric diagnoses, others may not hold different views. Plainly, diagnoses in the DSM are sometimes countered by the voices of those who – despite the DSM's general acceptance – may choose to offer other opinions. Such has occurred in conjunction with the public's interest in the contours of the diagnosis of ADD/ADHD.[15]

---

[13] *See, e.g., United States v. Cantu,* 12 F.3d 1506, 1509 n.1 (9th Cir. 1993) (taking judicial notice that a condition listed in the DSM is a recognizable psychiatric condition); *United States v. Murdoch,* 98 F.3d 472, 479 (9th Cir. 1996) (Wilson, J. concurring) (taking judicial notice of the diagnostic standards in the DSM).

[14] Expressly acknowledging the "evolving" nature of the scientific exercise necessary to develop each edition of the DSM, the Introduction to DSM-III-R stated that a systematic review of the various disorders and diagnostic criteria in the DSM-III was necessitated by the emergence of new data from scientific studies which were inconsistent with some of the existing diagnostic criteria. DSM-III-R Introduction at *xvii.* The edition expressly referred to "the last sentence of the Introduction of DSM-III which stated '. . . DSM-III is only one still frame in the ongoing [scientific] process of attempting to better understand mental disorders.' DSM-III-R represents another still frame." *Id.*

[15] In his opposition to Defendants' first Motions to Strike, Plaintiff presented the affidavits of three witnesses – a psychologist, a professor of public policy and social research, and a professor with a Ph.D. in social welfare – who apparently disagree with certain aspects of the DSM's diagnostic criteria for ADD and ADHD (although the *specific* basis of these differing views is impossible to discern from their affidavits). But whatever the particular grounds for their dissent may be, mere disagreement over scientific issues hardly proves fraud and is grossly insufficient to overcome the constitutional protection afforded to the APA's views in the DSM as a "rational interpretation" of a complex scientific debate. *See Metabolife,* 72 F. Supp. 2d at 1172.

1    But such scientific debate is not and should not be the stuff of lawsuits; rather, it is the

2 essence of free expression protected by the First Amendment. And it is the value of such free

3 expression that lies at the heart of the California Legislature's decision to protect it from abuse of

4 the judicial process by means of the anti-SLAPP statute. The APA's promulgation of diagnoses in

5 the DSM, including ADD/ADHD, represents "the constitutional right of free speech in connection

6

7 with a public issue or an issue of public interest," CCP § 425.16(e)(4), and furthers "the public

8 interest to encourage continued participation in matters of public significance." *Metabolife*, 72 F.

9 Supp. 2d at 1165. If Plaintiff's unfounded claims are permitted to proceed without satisfying the

10 requirements of CCP § 425.16, the APA's contribution to scientific discourse may be irrevocably

11

12 "chilled through abuse of the judicial process." *Id.*[16]

13    **B.    The APA's Collaborative Activities with the WHO and Other Federal
        Agencies in Developing the Diagnostic Criteria in the DSM Involves
14        Conduct in Furtherance of the Exercise of the Right of Petition Within
        CCP § 425.16(e)(4).**

15

16    The APA's development of diagnoses through the DSM constitutes not only free speech,

17 but also involves "conduct in furtherance of the exercise of the constitutional right of petition"

18 protected by CCP §425.16(e)(4).

19    As described above, the APA has frequently interacted with governmental bodies in the

20 development of the DSM and in governmental decisions regarding ADHD. In particular, the APA

21 has worked with the WHO over the years to achieve, insofar as possible, consistency between

22

23 DSM classifications and those of the WHO's parallel, independent classification system, the ICD.

24

25

26

27    [16] In his opposition to Defendants' original anti-SLAPP motions, Plaintiff clearly stated his
intent to prevent the APA from continuing to publish DSM-IV, as he asks to "enjoin" the "use of
the diagnostic criteria for ADD/ADHD as it currently exits." Omnibus Opp. At 12. Such a
28 request for injunctive relief against the APA is plainly an unconstitutional "prior restraint"
contrary to the most basic protections of the First Amendment. *See Wilson*, 13 Cal. 3d 652 (1975).

1  *See* Background, *supra* ¶¶ 4-5, 7.  The APA similarly has provided positions and information,

2  based on the DSM, to NIMH and ADAMHA in regard to their decisions regarding ADHD.  *Id.*

3     In addition to petitioning activity related to the development of diagnoses, the APA has

4  also been involved in petitioning activity concerning the public's understanding of them.  This has

5  been true, in particular, of the diagnoses of ADD and ADHD.  On at least two occasions within the

6  past five years, the APA has offered its views before Congressional Committees concerning the

7  subject.  *See* U.S. House of Representatives Subcommittee on Early Childhood, Youth and

8  Families, *Hearing on Ritalin Use Among Youth – Examining the Issues and Concerns* (2000); U.S.

9  House of Representatives Subcommittee on Human Resources and Intergovernmental Resources

10 of the Committee on Government Reform and Oversight, *Hearing on The Current Approaches to*

11

12 *Attention Deficit/Hyperactivity Disorder* (1996).  (App., Exhs. 15-16).

13

14     The primary allegation underlying Plaintiff's Amended Complaint against the APA –

15 namely, the allegedly fraudulent development, promotion, broadening and confirmation of the

16 diagnoses of ADD and ADHD (Amended Complaint ¶15) – plainly implicates the integrity of the

17 APA's ongoing dialogue with the government concerning these diagnoses, described above.  In

18 turn, this dialogue clearly constitutes "conduct in furtherance of the exercise of the constitutional

19

20 right of petition," CCP § 425.16(e)(4), even under a narrow interpretation of the anti-SLAPP

21 statute, much less, when the statute is "construed broadly."  CCP § 425.16(a).

22    **C.    The Development of the Diagnoses of ADD and ADHD Set Forth in the**
          **DSM Involves Statements Made Before, and in Connection with an**
23        **Issue under Consideration by Governmental Bodies Within CCP**
          **§ 425.16(e)(1) & (2).**
24

25     For these same reasons, the APA's conduct also finds protection under subsections (e)(1)

26 and (e)(2) of the anti-SLAPP statute.  The APA's statements to Congressional committees, and its

27

28 communications with the NIMH, ADAMHA, and WHO, regarding the diagnoses of ADD and

ADHD constitute both "written or oral statement[s] or writing[s] made before a legislative [or] executive . . . proceeding, or any other official proceeding authorized by law," and "written or oral statement[s] or writing[s] made in connection with an issue under consideration or review by a legislative [or] executive . . . body, or any other official proceeding authorized by law." CCP § 425.16(e)(1) & (2).

As the Supreme Court of California has recognized, "the Legislature's intent consistently has been to protect all direct petitioning of governmental bodies (including . . . administrative bodies) and petition-related statements and writings." *Briggs*, 19 Cal. 4th at 1121. Furthermore, such statements are protected even where, as here, they may have been made to improve universal understanding of a particular issue. *Id.* at 570 ("[T]he statute does not require that a defendant moving to strike under section 425.16 demonstrate that its protected statements or writings were made on its own behalf (rather than, for example, on behalf of . . . the general public).").

Because the integrity of the APA's statements to various governmental entities is implicated by Plaintiff's Amended Complaint, and because they find protection under subsections (e)(1) and (e)(2), the anti-SLAPP statute applies on this basis as well.

**D.    The Development of the Diagnoses of ADD and ADHD in the DSM Involve Statements Made in a Public Forum in Connection with an Issue of Public Interest Within CCP § 425.16(e)(3).**

Plaintiff concedes in his Amended Complaint that diagnoses in the DSM generate "great public attention." Amended Complaint ¶ 17. This is true not only in their publication, but also in their development, particularly within the psychiatric community.

As described above, each edition of the DSM involves consideration of proposed revisions submitted by professionals from within a broad spectrum of the medical community and other clinicians and researchers in the mental health field. Consequently, as these revisions are considered, the APA historically has published drafts of diagnoses and their diagnostic criteria.

19

Each such draft represents, in essence, the APA's widely-distributed and public contribution to an ongoing public debate about various aspects of these diagnoses.[17]  As such, the DSM plainly qualifies as a "public forum."

This conclusion is supported by the Court of Appeals' recent decision in *Damon v. Ocean Hills Journalism Club*.  In that case, the court determined that a private homeowners' newsletter, which was circulated to the members of the homeowners' association and local businesses, constituted a public forum.  85 Cal. App. 4th 468, 102 Cal. Rptr. 2d 205, 207, 211 (2000).  The court concluded that the newsletter "was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community.  All interested parties had full opportunity to read the articles in the newsletter." 85 Cal. App. 4th 468, 102 Cal. Rptr. 2d  at 211.  Because the DSM discusses "public matters," and various drafts and the final version were available to "all interested parties," it, too, constitutes a public forum.

As such, these statements made by the APA should find protection under subsection(e)(3) of the anti-SLAPP statute.  Furthermore, if Plaintiff's Prayer for Relief were to be granted, these statements made by the APA would be silenced.  This chilling of free speech is precisely what the California Legislature intended to inhibit by means of the anti-SLAPP statute.  CCP §425.16(a); *accord Garrison v. Baker*, No. 98-17038, 2000 WL 206575 at **1 (9th Cir. Feb. 23, 2000) ("In enacting the anti-SLAPP statute, the legislature made it clear that it wanted to prevent lawsuits brought to chill the valid exercise of constitutional rights.").

---

[17] For example, two years before publication of DSM-IV, the APA published and widely distributed for public comment the *DSM-IV Options Book*.  The *Options Book* presented "a comprehensive summary of the alternative proposals that were being considered for inclusion in DSM-IV in order to solicit opinion and additional data . . . ." DSM-IV at xvi (Intro.).  The following year, another draft of the proposed criteria was published and distributed for further public critique before DSM-IV was finalized.  *Id.*

## II. PLAINTIFF CANNOT ESTABLISH A PROBABILITY OF SUCCESS ON THE MERITS.

Because the conduct forming the basis of the Amended Complaint is protected activity in furtherance of petition and free speech rights within the meaning of the anti-SLAPP statute, Plaintiff must establish a "probability" that he will prevail on his claims at trial. To make that showing, Plaintiff must present sufficient evidence both to make a *prima facie* case and to meet the APA's constitutional defenses. *See Wilcox,* 27 Cal. App. 4th at 824. Here, Plaintiff must first present facts to support each element of his statutory claims; then, in view of the APA's showing that its conduct is protected under the First Amendment, Plaintiff must establish either (1) that the constitutional defenses are not applicable as a matter of law, or (2) facts which could reasonably be accepted by a jury that would negate those defenses. *Id.*

To make this showing, Plaintiff must come forward with competent and admissible evidence within the declarant's personal knowledge. *Church of Scientology v. Wollersheim,* 42 Cal. App. 4th 628, 654-55 (1996). Importantly, Plaintiff cannot rest on the allegations in the Complaint and the allegations are not accepted as true. *Id.* at 656. Averments based upon information and belief do not suffice to show a "probability" of prevailing on Plaintiff's claims. *Evans v. Unkow,* 38 Cal. App. 4th 1490 (1995); *Beilenson v. Superior Court,* 44 Cal. App. 4th 944 (1996). Moreover, in assessing the admissibility of a Plaintiff's evidence at this stage of the proceeding, the requirements of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) will apply. *Metabolife,* 72 F. Supp. 2d at 1167-70.

The burden to demonstrate the required "probability" of prevailing is extremely high. Indeed, the overwhelming majority of courts that have considered the "probability issue" have concluded that plaintiffs in those cases were not able to meet this standard and, accordingly, directed or affirmed dismissals. *See Metabolife,* 72 F. Supp. 2d at 1167-76; *Macias v. Hartwell,*

55 Cal. App. 4th 669 (1997); *Bradbury v. Superior Court*, 49 Cal. App. 4th 1108 (1996); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777 (1996); *Beilenson, supra*, 44 Cal. App. 4th 944; *Church of Scientology, supra*, 42 Cal. App. 4th 628-55; *Matson v. Devorak*, 40 Cal. App. 4th 539 (1995); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855 (1995); *Ludwig, supra*, 37 Cal. App. 4th 8; *Robertson v. Rodriguez*, 36 Cal. App. 4th 347 (1995); *Dixon v. Superior Court*, 30 Cal. App. 4th 733 (1994); *Wilcox, supra*, 27 Cal. App. 4th 809.

With the Amended Complaint, Plaintiff says that he has attempted to address the issues raised by the Defendants' anti-SLAPP motions. However, although Plaintiff has increased the number of allegations in the new Complaint, the quality of those allegations remains wholly insufficient to raise a legally cognizable claim against the APA. Plaintiff's Amended Complaint is long on conclusory accusations, but short on specific facts to support them, and reflects, largely, Plaintiff's disagreement with the methodology the APA used to develop and present the ADD criteria. For example:

Although Plaintiff asserts that "the [DSM-III] manual" includes "the diagnosis of ADD" "despite failing to meet [the DSM's own] standards" for diagnostic criteria (Amended Complaint ¶ 19), Plaintiff nowhere explains *how* the diagnostic criteria for ADD fail to meet these standards, or even what Plaintiff deems these valid standards to be.

Although Plaintiff says that "[i]n an effort to cover up this fraud, the APA improperly clustered the data from tests of the ADD diagnostic criteria with data supporting other unrelated conditions whose reliability was established," and that "[t]he intended and ultimate effect of such improper clustering was to inappropriately legitimize the unproven and arbitrary ADD diagnostic criteria" (Amended Complaint ¶ 20), Plaintiff

never identifies what data from what tests was "improperly clustered" or how these unspecified clusterings renders the diagnostic criteria "improper" or "arbitrary."

Although Plaintiff claims that "[i]n presenting the criteria in the guise of a scientific endeavor, APA misrepresented a fundamentally arbitrary set of criteria as a scientifically validated diagnostic set, misleading both clinicians, patients, the general public, and the class" (Amended Complaint ¶ 22), again he never pleads any specific facts that would explain in what way the criteria are "fundamentally arbitrary" and exactly how they allegedly misled anybody.[18]

Although Plaintiff avers that the "efforts by the APA, to improperly expand the diagnostic criteria for ADD are revealed in the current version of the DSM, the DSM IV-TR," where "the APA added the diagnosis of ADHD 'not otherwise specified'" (Amended Complaint ¶ 23), he does not explain this cryptic contention or how it supports a legally viable claim for relief.

These examples from Plaintiff's Amended Complaint demonstrate that – even after an opportunity to revise the Complaint in light of Defendants' SLAPP arguments – Plaintiff has failed even to plead facts to substantiate the purported conspiracy that he alleges, much less to overcome the APA's constitutionally protected right to discuss and publish its views in the DSM. The bottom line is that, notwithstanding Plaintiff's disagreement with the DSM methodology and content, the APA's views as expressed in the DSM are clearly a "rational interpretation" of a complex scientific debate and, as such, are entitled to First Amendment protection as this Court

---

[18] Of course, one of the most fundamental holes in Plaintiff's Complaint is his utter failure even to identify who his treating physician was or is and whether and the extent to which that treating physician relied on the DSM. Without that critical causal link, Plaintiff has no case, even assuming he could overcome the First Amendment defenses.

1   held in *Metabolife*, 72 F. Supp. 2d at 1172.  Accordingly, Section 425.16 requires that the

2   Amended Complaint be stricken.

### CONCLUSION

5   For the reasons set forth above, the APA respectfully requests that its special motion

6   pursuant to CCP § 425.16 be granted and Plaintiff's Amended Complaint be stricken with

7   prejudice.

Respectfully submitted.

10   DATED:  February 2, 2001

By: _____
David J. Noonan
Dorothy A. Johnson
**POST KIRBY NOONAN & SWEAT  LLP**
600 West Broadway, Suite 1100
San Diego, California  92101-3387
Telephone: (619) 231-8666


David B. Siegel (*Pro Hac Vice*)
JoAnn E. Macbeth
Laurel Pyke Malson (*Pro Hac Vice*)
Luther Zeigler (State Bar No. 122154)
William L. Anderson (*Pro Hac Vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone:  (202) 624-2500


Attorneys for Defendant
American Psychiatric Association